**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**



|  |  |  |
|---|---|---|
| WILLARD L. SMITH, III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:14-cv-764 |
| | ) | |
| DONALD W. BRENNAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION

This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52(a), following a bench trial. For the reasons set forth below, judgment will be entered in favor of Defendants.

### I.    Background

This suit arises out of an employment relationship between Plaintiff Willard Smith, III and Defendants Donald Brennan, Michael Brennan, and their company, Brennan's Heating and Air Conditioning Service, Inc. ("Brennan's HAC"). On June 20, 2014, Smith filed a one count complaint alleging violations of the minimum wage and overtime provisions of the Fair Labor Standards Act ("FLSA"). In the Complaint, Smith alleged he was entitled to recover $55,282.50 in compensatory damages for unpaid wages[1] as well as an equivalent amount in liquidated damages. Defendants answered, and a brief discovery period ensued.

At the bench trial, held on March 24, 2015, Smith presented his own testimony as well as that of Defendant Michael Brennan and the manager of Brennan's HAC's Service Department, Joseph English. After Smith rested, Defendants again called Michael Brennan and Joseph

---

[1] Smith seeks back wages for the period following his promotion in April 2012.

English.  Defendant Donald Brennan also testified.  Finally, Defendants called Brennan's HAC

employee Christopher Fox and former employee Jonathan Tinker.  Although the Court found

Smith for the most part credible, it found the defense witnesses' recollection of the events to be

more consistent and reliable.  In light of these credibility determinations, the Court makes the

following factual findings.

## II.     Findings of Fact

Defendant Brennan's HAC is a heating, ventilation, and air conditioning contractor

incorporated and based in Virginia.  At all relevant times, Brennan's HAC was subject to the

overtime provisions of the Fair Labor Standards Act of 1938 ("FLSA"), as amended.  Defendant

Donald Brennan established Brennan's HAC in 1979 and is its sole shareholder.  He also serves

as the company's President and CEO.  His son, Defendant Michael Brennan, is the Vice President

of the company and serves as its on-site manager.  Donald Brennan regularly consults with

Michael Brennan on company matters.

Plaintiff Willard Smith, III had been a service mechanic with the company for

approximately 13 years.  In this position, he was paid hourly.  Prior to April 2012, Michael

Brennan was the manager of Brennan's HAC's Service Department, Joseph English was the

manager of the Installation Department, and Nancy Dempsey was the manager of the

Administrative Department.  The parties have stipulated that the Installation Department at

Brennan's HAC was a "recognized department" within the meaning of the applicable Department

of Labor ("DOL") regulation, 29 C.F.R. § 541.100(a).

On April 1, 2012, Smith was promoted to the position of Installation Supervisor with an

annual salary of $65,000.00.  This salary was calculated from the average of his salaries in the

previous three years, including overtime pay and bonuses.  Following Smith's promotion,

Michael Brennan became Vice President in charge of sales and Joseph English became the

2

manager of the Service Department. In his new position, Smith would arrive between 6:30 and 6:45A.M., and typically left between five and six o'clock on average. Thus, he routinely worked over forty hours per week. At no point was he paid overtime, also known as "time and a half," for the hours that he worked over forty during his eighteen months as Installation Supervisor.

In his position as Installation Supervisor, Smith "customarily and regularly directed the work of two or more other employees." Stipulated Uncontested Facts ("Stip.") ¶ 4. Specifically, there were between nine and twelve lead installers and helpers under Smith's supervision during the pertinent time period. In addition to supervisory duties, Smith scheduled the installation jobs ("installs"), assigned all of the installers their work, ordered all equipment parts and metal needed, made sure items were ready for the next day's installs, entered the installs into the computer, prepared the paperwork and checklist for the installation jobs, processed the paperwork necessary to obtain county permits, secured safety equipment for the employees, and answered customers' calls concerning installation of equipment and accessory items. Installation Department employees reported to Smith when they called in sick, needed to leave work early, or needed parts or equipment for an install. He also handled their requests to change their schedules. The installers occasionally called English, the former head of the Installation Department, for troubleshooting advice, but this occurred only when Smith could not answer their questions. Notably, despite calling on English for help, the Installation Department employees viewed Smith, not English, as their boss. For all intents and purposes, Smith was the manager of these employees.

Smith had no role in the following activities: procuring new vehicles, pricing the equipment sold by Brennan's HAC, determining which financing options would be offered to customers, establishing offers on coupons, having Brennan's HAC designated as an authorized dealer by certain vendors, managing the budget, deciding which insurance to use for company

3

vehicles, advertising and marketing Brennan's HAC products, human resources tasks, or establishing an employee handbook. Nor was Smith consulted "regarding the strategic decisions of the company," including "business, advertising, which way we were going in the future, purchasing of new trucks." Trial Tr. 113:22–114:5.

Smith denies having provided training for the installers. Michael Brennan testified, however, that Smith trained the new hires "about all the paperwork that they would have to complete, the parts list, how we fill out our service tickets, our certificate of inspections with our customers, [and] show[ed] them were to load the equipment." Id. at 162:14–163:2. Although it is possible that the lead installers trained the new hires rather than Smith, there is no testimony to that effect. The Court will therefore accept Brennan's testimony on the issue, as it is the most credible.

Smith did not have a role in hiring new employees. He was not permitted to sit in on interviews. He did not review resumes or applications. Instead, he was merely informed when interviews were taking place. Similarly, Smith was "just informed" as to employees' wage rates and "had no input" on them. Id. at 93:23–94:5. During a meeting with English and Donald and Michael Brennan, however, Smith told them that the installers "want raises too." Id. at 51:14–16. Due to the wage freeze in place at the time, the request "was not acted upon." Id. at 97:3–10.

Smith did, however, have the authority during a new hire's 90 day probationary period to recommend termination or continued employment with the company. Based on his evaluations, which he communicated to Michael Brennan orally, certain probationary employees were retained, resulting in modest wage increases for them. Smith had occasion to observe and evaluate the installers' performance when he conducted "quality checks." Id. at 65:3–16. He could also gauge the installers' performance based on whether "the work was getting done." Id. at 68:19–25. Due to the wage freeze, Smith never filled out any written performance review

4

forms, which had previously been utilized at Brennan's HAC to evaluate employees for raises. Nonetheless, Michael Brennan would regularly ask for his input regarding the performance of the installers, as he was "the only person that could report on them." *Id.* at 86:22–87:6. Indeed, Smith admitted that, with respect to new hires, "someone might ask how they are doing" after a week or two on the job. *Id.* at 23:21–24. According to Brennan, Smith would say the employee was "doing fine," or "would work well out here." *Id.* at 163:14–18; 165:12–19. Based on Smith's positive verbal performance evaluations, Christopher Fox, Michael Stinson, Tyler Ahern, and Tyler Knight were all retained beyond their 90 day probationary periods and given raises.

With respect to Smith's influence on termination decisions, the parties dispute whether he recommended that two new hires, Richard Shaw and Luke Danison, be terminated at the end of their probationary periods. Luke Danison was fired for snorting an unknown substance at work. Smith testified that one of the service technicians who had been working with Danison called English, and that English relayed the message to him. *Id.* at 71:15–72:6. Smith maintained that he had "no opinion" on whether Danison should be terminated, but "offered no objection." *Id.* at 72:15–18. By contrast, Michael Brennan testified that "Smith brought it to my attention that the lead installer of that job site came to him and informed him that Luke Danison was snorting some sort of ... drug." *Id.* at 85:14–18. Based on Smith's recommendation that he "wanted to get rid of" Danison, Brennan terminated him. *Id.* at 85:10–86:3.

Brennan also testified that Smith recommended the termination of another Installation Department employee, Richard Shaw. He stated that Smith told him Shaw "wasn't doing well in his department," and that Smith's "lead installer was coming to him and told him he was struggling." *Id.* at 89:17–21. Brennan emphasized that the lead installers did not report Shaw's poor performance directly to him, but rather communicated the message to Smith, who then communicated it to him. Tinker, the lead installer that had been working with Shaw,

5

corroborated this version of events by testifying that he reported to Smith, not Brennan or English, that Shaw "wasn't any good." *Id.* at 152:13–23.

Although there is evidence in the record that supports both sides on this issue, the Court finds it much more likely that the installers communicated their concerns about these employees to Smith, whom they viewed as their boss and to whom they routinely reported to and called whenever they had an issue. Tinker's testimony is especially persuasive, given that he is not a party to the action nor a current employee of Brennan's HAC. Accordingly, the Court finds that Smith communicated that two new hires, Richard Shaw and Luke Danison, should be terminated at the end of their probationary periods, and Brennan's HAC followed those recommendations.

On September 29, 2013, Smith was demoted from Installation Supervisor to his previous position as an hourly employee. He resigned the next week, and this lawsuit followed.

### III.    Conclusions of Law

#### A. *Jurisdiction and Venue*

This Court has federal question subject matter jurisdiction over the matter pursuant to sections 1331 and 1337 of Title 28 of the United States Code, which confer original jurisdiction over any civil action arising under a federal statute like the FLSA. Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district.

#### B. *FLSA Overtime Claim*

The FLSA was enacted to protect "the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others." *Benshoff v. City of Va. Beach,* 180 F.3d 136, 140 (4th Cir.1999) (quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 597 (1944)). "[B]ecause the Act is remedial and humanitarian in purpose, it should be broadly interpreted and applied to effectuate its goals." *Id.* (citation and quotation

marks omitted).  In addition to mandating a minimum wage for covered employees, FLSA

requires employers to pay such employees time and a half, colloquially known as overtime, for

each hour worked in excess of forty during any given workweek.  29 U.S.C. §207(a)(1).

There is, however, an exemption that states that these provisions do not apply to "[a]ny

employee employed in a bona fide executive, administrative, or professional capacity . . . ."  29

U.S.C. § 213(a)(1).  Significantly, the burden rests with the employer to establish by clear and

convincing evidence that an employee qualifies for the exemption.  *Shockley v. City of Newport

News*, 997 F.2d 18, 21 (4th Cir.1993).  Courts have routinely utilized a Department of Labor

("DOL") regulation to determine whether the exemption is applicable to a particular employee.

*E.g., Madden v. Lumber One Home Ctr., Inc.*, 745 F.3d 899, 903 (8th Cir. 2014).  The regulation

defines an "executive" employee as any employee:

> (1) Compensated on a salary basis at a rate of not less than $455 per
> week ... exclusive of board, lodging or other facilities;
> (2) Whose primary duty is management of the enterprise in which
> the employee is employed or of a customarily recognized
> department or subdivision thereof;
> (3) Who customarily and regularly directs the work of two or more
> other employees; and
> (4) Who has the authority to hire or fire other employees or whose
> suggestions and recommendations as to the hiring, firing,
> advancement, promotion or any other change of status of other
> employees are given particular weight.

29 C.F.R. § 541.100(a).  Importantly, due to the remedial nature of the FLSA, this exemption is to

be narrowly construed.  *Hantz v. Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 619 (E.D. Va. 2014)

(citing *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960) ("We have held that these

exemptions are to be narrowly construed . . . .")).

The parties agree that the DOL regulation is the appropriate test for determining whether

Smith is an exempt executive employee.  Dkt. Nos. 25, 26.  They have also stipulated that he

7

meets the first and third prongs of the regulation. Stip. ¶¶ 2, 4. The Court will therefore address

whether its factual findings satisfy the second and fourth prong of the regulations.

      *i.*    *Whether Smith's Primary Duty was Management of an Enterprise or of a Customarily Recognized Department or Subdivision Thereof*

      With respect to the second prong of the DOL regulation, the parties have stipulated that

the Installation Department is a recognized department within Brennan's HAC. Stip. ¶ 3. The

question remains, then, whether Smith's primary duty was management of that department. The

regulation explains that "management" includes, but is not limited to, the following activities:

> (1) interviewing, selecting, and training of employees; (2) setting
> and adjusting their rates of pay and hours of work; (3) directing the
> work of employees; (4) maintaining production or sales records for
> use in supervision or control; (5) appraising employees'
> productivity and efficiency for the purpose of recommending
> promotions or other changes in status; (6) handling employee
> complaints and grievances; (7) disciplining employees; (8) planning
> the work; (9) determining the techniques to be used; (10)
> apportioning the work among the employees; (11) determining the
> type of materials, supplies, machinery, equipment or tools to be
> used or merchandise to be bought, stocked and sold; (12)
> controlling the flow and distribution of materials or merchandise
> and supplies; (13) providing for the safety and security of the
> employees or the property; (14) planning and controlling the
> budget; and (15) monitoring or implementing legal compliance
> measures.

29 C.F.R. § 541.102 (numeric parentheticals added).

      Of the fifteen activities identified in the DOL regulation, the record shows that Smith

regularly performed eleven of them. Smith customarily and regularly "directed" the work of the

Installation Department employees (activity 3). Stip. ¶ 4. He trained the new hires on how to

complete the paperwork associated with the work as well as how to load equipment (activity 1).

He scheduled the installation jobs and assigned all of the installers their work (activities 8 and

10). He ordered all equipment parts and metal needed and made sure items were ready for the

next day's installs (activities 11 and 12). He prepared the paperwork and checklist for the

installation jobs, and entered such information into the computer (activities 4 and 8). He
processed paperwork necessary to order county permits (activity 15). He secured safety
equipment for the Installation Department employees (activity 13). Installation Department
employees reported to Smith when they called in sick, needed to leave work early or change their
schedule, or needed parts or equipment for an install (activities 2 and 12). Lastly, he assessed the
installers' performance—*i.e.*, their productivity and efficiency—for the purpose of recommending
retention beyond their 90 day probationary period (activity 5). These facts clearly show that
Smith engaged in management.

This is not the end of the inquiry, however, as the Court must now decide whether
management was Smith's primary duty. The DOL regulation defines "primary duty" as the
"[p]rincipal, main, major or most important duty that the employee performs." 29 C.F.R. §
541.700(a). In making this determination, courts consider factors including:

> [t]he relative importance of the exempt duties as compared with
> other types of duties; the amount of time spent performing exempt
> work; the employee's relative freedom from direct supervision; and
> the relationship between the employee's salary and the wages paid
> to other employees for the kind of nonexempt work performed by
> the employee.

*Id.* Smith maintains that management was not his primary duty because the majority of his duties
were "clerical in nature rather than managerial." Pl.'s Proposed Conclusions of Law ¶ 9.
Defendants contend that management was his primary duty because the paperwork that he
performed was in connection to his managerial duties. Def.'s Proposed Findings of Fact ¶ 18. To
resolve the issue, the Court will consider the "primary duty" factors set forth in the DOL
regulation below.

a) The relative importance of the exempt duties as compared with other types of duties

"Courts determine how important exempt duties are by measuring 'the significance of the managerial tasks to the success of the facility.'" *Pollard v. GPM Invs., LLC*, No. 3:10-cv-115, 2011 WL 864329, at \*6 (E.D. Va. Mar. 10, 2011) (quoting *Haines v. S. Retailers, Inc.*, 939 F. Supp. 441, 450 (E.D. Va. 1996)). For example, in *Jones v. Virginia Oil Co.*, the Fourth Circuit held that a convenience store manager who spent seventy-five to eighty percent of her time performing non-managerial tasks, such as cooking burgers, was exempt where the store "could not have operated successfully unless Jones performed her managerial functions." 69 F. App'x 633, 635, 638 (4th Cir. 2003).

Although Smith describes tasks such as "ordering supplies," "setting up next day installs," and "dispatching technicians to install ... equipment" as clerical, these tasks fall neatly within the DOL regulation's definition of "management" activities—specifically, activities 8, 10, and 11 described above. *See* Pl.'s Proposed Findings of Fact ¶ 17. Moreover, as Installation Supervisor, many management duties were performed solely by Smith and therefore can reasonably be considered essential to the success of the company. This factor thus counsels in favor of exemption.

b) The amount of time spent performing exempt work

The DOL regulations instruct that this factor is not dispositive of the primary duty issue. 29 C.F.R. § 541.700(b). Indeed, employees can spend significantly less than 50% of their time performing nonexempt duties and still be considered exempt. *Id.*; *see also Jones*, 69 F. App'x at 635, 638 (upholding exemption for defendant who spent only 20 to 25% of her time performing management tasks); *Pollard*, 2011 WL 864329, at \*7 ("[E]ven if a Plaintiff spends just a few hours each day, or twenty percent of her work week, on managerial tasks, she can be properly

classified as exempt if she meets the other requirements for exemption."). Furthermore, "a manager continues to engage in management duties if he or she supervises other employees or does other exempt work while performing non-exempt work." *Pollard*, 2011 WL 864329, at *7.

Here, Smith has admitted to engaging in the numerous management activities described above. As Installation Supervisor, he supervised the installers and was continuously on call to handle any issues brought to his attention, even while he was performing more clerical, non-exempt tasks in the office. Although the parties did not testify as to the exact amount of time Smith spent performing exempt work, it strains credulity to find that he did not spend at least twenty percent of his time performing managerial tasks. Thus, this factor also favors exemption.

c) The employee's relative freedom from direct supervision

Although Smith has maintained throughout the proceedings that English was his supervisor, there is nothing on the record to support that claim besides his own self-serving assertions. Importantly, the test is not whether there were other people above Smith on the totem pole, but rather whether he had "sufficient freedom from direct supervision." *Pollard*, 2011 WL 864329, at *8. In *Pollard*, this Court found a deli manager had sufficient freedom from direct supervision even though he "was not authorized to issue refunds to customers," and had to seek approval of the store manager before disciplining employees or rearranging employee schedules. *Id.*

In this case, it is clear that Smith had sufficient freedom from direct supervision in his position as Installation Supervisor. Unlike the deli manager in *Pollard*, Smith had control over his installers' schedules. Also distinct from *Pollard*, Smith issued verbal warnings to the installers when they made mistakes on the job, without having to discuss the issue with Michael Brennan first. *See* Trial Tr. 149:5–24 (Tinker's testimony on how Smith "would tell me what went wrong and what I need not to do next time"). Although Brennan serves as the on-site

11

manager of the company, it is clear from the testimony that Smith was able to engage in

significant management duties without Brennan's interference or supervision. Likewise, English

was the manager of the Service Department and had no role in supervising Smith in his duties as

manager of the Installation Department. As a result, this factor also weighs in favor of

exemption.

> d) <u>The relationship between the employee's salary and the wages paid to
> other employees for the kind of nonexempt work performed by the
> employee</u>

There does not appear to be any testimony concerning a disparity in wages between Smith

and other Brennan's HAC employees who performed nonexempt work. The only relevant

testimony shows that Smith was given an annual salary of $65,000 whereas the dispatchers to

whom he analogizes himself were paid hourly. This factor is accordingly neutral.

Considering all of the DOL factors as a whole, the record clearly establishes that Smith's

primary duty was management of the Installation Department of Brennan's HAC. The Court

thereby concludes that Defendants have satisfied the second prong of the exempt executive

regulation.

> ii. *Whether Smith Had the Authority to Fire or Fire Other Employees or Whose
> Suggestions and Recommendations as to the Hiring, Firing, Advancement, Promotion
> or Any Other Change of Status of Other Employees Are Given Particular Weight*

Turning to the fourth prong of the DOL regulation, Smith posits that this prong is not met

because he did not have authority to hire or fire Brennan's HAC employees. As the language of

the regulation expressly states, however, an employee may meet this prong if his suggestions and

recommendations as to the hiring or firing of other employees are "given particular weight." 29

C.F.R. § 541.100(a). In making its determination, the Court must consider factors such as:

> whether it is part of the employee's job duties to make such
> suggestions and recommendations; the frequency with which such
> suggestions and recommendations are made or requested; and the

> frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

29 C.F.R. § 541.105. Based on this guidance, courts have found "particular weight" was given to an employee's input where her performance reviews affected another employee's pay. *E.g.*, *Gelhaus v. Wal–Mart Stores, Inc.*, 769 F. Supp. 2d 1071, 1081–82 (E.D. Tex. 2011). "Particular weight" was also found to have been attached to an employee's input where his supervisor depended on his recommendation as to whether a probationary employee should be retained and offered regular employment. *Martin v. Yokohama Tire Corp.*, No. 7:11-cv-00244, 2013 WL 6002344, at *11 (W.D. Va. Nov. 12, 2013).

In this case, it is clear that Smith did not have a role in the hiring of new Installation Department employees nor in setting their pay rates. He did, however, have the authority during a new hire's 90 day probationary period to recommend termination or continued employment with the company. Michael Brennan relied on Smith's informal evaluations of these new hires, which were communicated to him orally. Smith was "the only person that could report on" their performance, given that he observed them during "quality checks" and kept track of whether "the work was getting done." *Id.* at 65:3–16, 68:19–25, 86:22–87:6. Based on his positive, albeit informal, performance evaluations, Christopher Fox, Michael Stinson, Tyler Ahern, and Tyler Knight were all retained beyond their 90 day probationary periods and given modest wage increases as a result. The record thus shows that Smith's input as to these new hires' change in status from probationary employee to permanent employee was given "particular weight."

13

As discussed in more detail in the Court's Findings of Fact, with respect to Smith's influence on termination decisions, there is evidence to support the stances of both sides. Nevertheless, the Court finds it much more likely, particularly in light of Tinker's testimony, that the installers communicated their concerns about Danison's misconduct and Shaw's poor performance to Smith, whom they viewed as their boss, and who in turn recommended the termination of these employees to Brennan. Accordingly, the Court finds that Smith's recommendation that these two new hires be terminated at the end of their probationary periods was followed by Brennan's HAC and therefore given "particular weight."

Based on the above, the Court finds that, although Smith did not have the authority to hire, fire, promote, or change the status of employees within his department, his recommendations regarding most of those decisions were given particular weight. The Court therefore concludes that Defendants have satisfied their burden on the fourth prong of the DOL regulation.

## IV.  Conclusion

For the reasons stated above, all of the elements of the DOL regulation have been met. Smith is thus properly classified as an exempt executive employee under the FLSA and is not entitled to its overtime protections. Judgment will accordingly be entered in favor of Defendants pursuant to Federal Rule of Civil Procedure 58.

An appropriate Order shall issue.


July 13, 2015

Alexandria, Virginia

/s/

Liam O'Grady
United States District Judge


14